DEVONSHIRE DEVELOPMENT ASSOCIATES, PLAINTIFF, v.
CITY OF HACKENSACK, DEFENDANT.

Tax Court of New Jersey

March 30, 1981.

*Daniel Amster,* for plaintiff.

*Steven Muhlstock,* for defendant (*Melvin Gittleman,* attorney).

EVERS, J. T. C.

Devonshire Development Associates (taxpayer) brings this motion for summary judgment which concerns the effect of *N.J.S.A.* 54:2–40.4 and *N.J.S.A.* 54:3–22(c) to (f) (hereinafter referred to collectively as chapter 123) on the limitation imposed by the jurisdiction of the county tax boards and the Tax Court, by *Matawan v. Tree Haven Apartments, Inc.,* 108 *N.J.Super.* 111 (App.Div.1969). The facts follow.

Taxpayer filed a complaint in the Tax Court alleging that the Bergen County Tax Board (board) did not have the authority to increase the original assessments on a group of condominium units without the City of Hackensack (city) having filed an appeal from the original assessment. In the alternative, taxpayer's petition alleged discrimination. It claimed discrimination in contravention of the constitutional theory of discrimination as set forth in *In re Appeal of Kents*, 34 *N.J.* 21 (1961), as well as the discrimination relief set forth in chapter 123.[1] Taxpayer's theory implied that "constitutional" as well as "statutory" discrimination are alternative causes of action. The county board increased the original assessment in accordance with chapter 123 without the presence of a municipal appeal. The taxpayer claims such action is *ultra vires* and prays for "judgment reversing the action of the Bergen County Board of Taxation." Taxpayer argues that *Matawan* prohibits the increase of an assessment beyond the original one in absence of an appeal by the taxing district from the original assessment. Chapter 123, according to the taxpayer, has not changed that rule.

The city argues that *Matawan* is in irreconcilable conflict with *Fort Lee v. Hudson Terrace Apartments*, 175 *N.J.Super.* 221 (App.Div.1980), certif. den. 85 *N.J.* 459 (1980), and is therefore eviscerated if not overruled. Additionally, the city argues that the Tax Court or the county tax board may increase the assessment beyond the original assessment by virtue of chapter 123 despite the questionable vitality of *Matawan*. In order to put the issues in proper focus, a detailed analysis of *Matawan* must be undertaken.

---

[1]The form of the county board petition has the following format:

| Basis for Appeal: | ☐ True Value | Discrimination Appeal (See instruction 9) | Tax Court Pending ☐ Yes   ☐ No |
|---|---|---|---|
| | | ☐ Conventional ☐ Excess over common level (Chapter 123, P.L. 1973) | If yes, list year. |

In *Matawan* the taxpayer attacked a judgment of the Division of Tax Appeals (Division) that found the value of its property at $14,000 above the original assessment. The taxing district relied on *N.J.S.A.* 54:2–35 in order to sustain the action of the Division. This provision stated that any county tax board action may be appealed to the Division, "and it *may* review such action and proceedings and give such judgment thereon as it may think proper" (emphasis supplied).[2] The court (108 *N.J.Super.* at 119) construed this provision as never having intended to allow an increase of an assessment "after the tax list had been reviewed, approved and returned by the county tax board, *in the absence of an appeal or equivalent procedure, based upon timely notice to the party whose property was to be affected by the change.*" (Emphasis supplied). Emphasizing the importance of the notice requirement the court said:

> To the extent here relevant, changes or alterations are to be made by the county tax board, acting in its appellate capacity, *N.J.S.A.* 54:3–21, in which case the requisite notice of any proposed upward revision would be contained in the petition of appeal filed by the taxing district. In the absence of such a notice a taxpayer should be entitled to assume that his assessment is not being challenged as too low. Many individual taxpayers appear pro se before county tax boards. Without such assumption, a taxpayer would never know when he would be required to retain counsel and submit expert testimony in defense of his assessment. The inevitable result would be to discourage appeals to the county tax board regardless of merit. [At 118]

In support of its vitality taxpayer correctly points to several Tax Court decisions that have adhered to the *Matawan* limitation. *See Lamm Associates v. West Caldwell,* 1 *N.J.Tax* 373 (Tax Ct.1980). Yet, the anomaly of *Fort Lee v. Hudson Terrace Apartments, supra,* remains and appears to be directly contrary to *Matawan.*

In *Hudson Terrace* the Appellate Division held that the Division erred in applying the average ratio of assessments to true value in the taxing district as determined by the Director of the

---

[2]This provision was amended by *L.* 1979, *c.* 114, § 3, and essentially struck any reference to the Division of Tax Appeals and replaced it with the Tax Court.

Division of Taxation without proof that there was no common level of assessments for the year in question (1976). In computing the value of the improvements for the year 1976 the court found an assessment figure higher than the original assessment. The court did not even mention *Matawan*, or the limitation imposed by that case, in its published opinion. Accordingly, it would be error for this court to simply ignore *Matawan* on the basis of *Hudson Terrace*, even though on motion for rehearing the Appellate Division denied the application, remarking that:

SUPPLEMENTAL: The petition for rehearing is denied. See *N.J.Constitution* 1947, Art. VII, § I, par. 1; *N.J.S.A.* 54:4–23; *Samuel Hird & Sons, Inc. v. Garfield*, 87 *N.J.Super.* 65, 75 (App.Div.1965); *Hackensack v. Rubinstein*, 37 *N.J.* 39, 52 (1962); *Rek Investment Co. v. Newark*, 80 *N.J.Super.* 552, 557–558 (App.Div.1963).

The above-cited cases in the Appellate Division order were all cited in *Matawan* and are clearly distinguishable. Consequently, on this argument alone *Matawan* cannot be circumvented. *See Campbell v. Schlaifer*, 88 *N.J.Super.* 66 (App.Div. 1965). While a trial court need not necessarily agree with the opinions of appellate tribunals, it cannot disregard them. *Reinauer Realty Corp. v. Paramus*, 34 *N.J.* 406, 415 (1961), and *Lewandowski v. National Grange Mut. Ins. Co.*, 149 *N.J.Super.* 591 (Law Div.1977). The Supreme Court is the final arbiter, and an intent to alter settled law of this State cannot be attributed to the appellate courts in absence of express, clear disapproval of existing law and a definite repudiation of decisions establishing that law. *Russ v. Metropolitan Life Ins. Co.*, 112 *N.J.Super.* 265 (Law Div.1970).

The essence of chapter 123 is found in two separate provisions which govern such causes of action on the county tax board and Tax Court levels.

*N.J.S.A.* 54:3–22 pertains to actions at the county tax board level and provides in pertinent part:

... c. Whenever the County Board of Taxation is satisfied by the proofs that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit *or falls below the lower limit of the common level range, it shall revise the taxable value of the property by applying the average ratio to the true value* of the property except as hereinafter provided. [Emphasis added]

d. If the average ratio is below the county percentage level and the ratio of the assessed value of the subject property to its true value exceeds the county percentage level, the county board of taxation shall reduce the taxable value of the property by applying the average ratio to the true value of the property.

e. If both the average ratio and the ratio of the assessed value of the subject property to its true value exceed the county percentage level, the county board of taxation shall revise the taxable value of the property by applying the county percentage level to the true value of the property.

f. The provisions of this section shall not apply to any appeal from an assessment of real property taken with respect to the tax year in which the taxing district shall have completed and put into operation a district wide revaluation program approved by the Director of Taxation pursuant to Chapter 424, Laws of 1971 (C. 54:1–35.35 et seq.)

*N.J.S.A.* 54:2–40.4 pertains to Tax Court actions and is essentially identical to the county tax board provisions. The only appreciable difference is that *N.J.S.A.* 54:2–40.4 states that chapter 123 relief is not appropriate where "a reassessment program approved by the county board of taxation", in addition to cases where a district wide revaluation, has taken place.

The core of chapter 123 is found in *N.J.S.A.* 54:1–35a and *N.J.S.A.* 54:1–35b, which establish the statistical formula for an action grounded in discrimination. These sections define the key terms "average ratio" as "that ratio promulgated by the Director of the Division of Taxation pursuant to *N.J.S.A.* 54:1–35.1 et seq. as of October 1st of the year preceding the tax year," and the "common level range" as "that range which is plus or minus 15% of the average ratio for that district".[3] The director of the division of taxation is directed, on or before April 1st in each year, to determine the average ratio and common level range.

Chapter 123 was in large part a legislative response to the problem of proving a discriminatory assessment in cases where *Kents* relief is sought. (*In re Appeal of Kents*, 34 *N.J.* 21 (1961)). The elements of a *Kents* action were succinctly set

---

[3]The use of the unweighted, unclassified arithmetic average ratio for the 1978 tax year was changed to a weighted average based on sales in each class for the 1979 tax year and thereafter. *L.* 1979, *c.* 51.

forth in *Continental Paper Co. v. Ridgefield Park*, 122 *N.J.Super.* 446 (App.Div.1973):

> ... In order to make out a case of actionable discrimination, these elements must be proved: (1) that the real property generally in the municipality was assessed at less than true value; (2) what the common assessment level *was* and (3) the true value of the subject property upon which the common level percentage would operate. *Reading Co. v. Woodbridge Township*, 45 *N.J.* 407, 426 (1965); *Matawan v. Tree Haven Apartments, Inc., supra*, 108 *N.J.Super.* at 116; *Feder v. Passaic*, 105 *N.J.Super.* 157, 160 (App.Div.1969). If there is *no* common level shown and there *is none which the assessor is endeavoring to apply*, and the assessment is substantially higher than the "average ratio" determined by the Director of Taxation, the "average ratio" may be applied under *Kents*, and the assessment reduced by that proportion. *Matawan v. Tree Haven Apartments, Inc., supra*, 108 *N.J.Super.* at 116; *Feder v. City of Passaic, supra*, 105 *N.J.Super.* at 166. [At 450–451]

Chapter 123 effectively relieves a party from proving the first and second elements in the above equation. In a pre-chapter 123 discrimination action a party labored to prove these elements by extensive statistical studies introduced through experts. *See R.M.P. Holding Co. v. Passaic*, 1 *N.J.Tax* 359, 367–371 (Tax Ct.1980), and *Niktan Realty Co. v. Passaic*, 1 *N.J.Tax* 393, 403–407 (Tax Ct.1980). Chapter 123 supplies a bypass as to those elements that have been developed by the courts through the years.

It has been oft-stated that *In re Appeal of Kents, supra,* was the first case that provided a remedy in discrimination (in assessment) cases. It was a judicial recognition of the constitutional right to commensurate, substantially uniform treatment vis-a-vis taxpayers within a particular taxing district. In fashioning the remedy to right the wrong, the Supreme Court had to resort to the application of the Director's average ratio calculated pursuant to *N.J.S.A.* 54:1–35.1 (the school aid ratio) where there was no other statistical indication of a uniform percentage of the assessed value to true value within the taxing district, i. e., a common level. The court candidly admitted that such a "ratio application" was wanting and stated:

> It may be added that our Legislature accepted and specified the average ratio (unweighted) as the level with respect to the assessment of tangible personal property used in business if it should be less than the percentage fixed under the

new statute to which we have already referred. L. 1960, c. 51, § 8. We are aware that the Legislature has not yet acted finally upon a bill (S. 2) which would use the unweighted average ratio as the central figure in a remedy for unequal taxation of real property. But until some better technique appears or some other suitable one is provided by statute, we are satisfied to utilize the average ratio in cases such as the one before us. [at 33]

With respect to the technical elements of a discrimination action, the significance of *Kents* lies in its use of the Director's school aid ratio. The court explained the school aid ratio as follows:

The State Director's average ratio and the general ratio of the county board are primarily intended to meet the problem of *intermunicipal* inequality. They are designed to establish the total true value of the aggregates of real property within each municipality, in the one case for the purpose of fixing a basis for the distribution to municipalities of State aid for education, and in the other to fix the basis for the allocation among municipalities of the burden of taxation for the support of county government. These ratios are found essentially by comparison of the selling prices of parcels of property with their assessed values. The State Director calculates the average ratio of the reported sales of real property in four classes: (1) vacant land; (2) resident; (3) farm; and (4) "other" (including commercial, industrial, apartment houses, etc.). The ratio is unweighted to reflect the value of the parcels sold and the total aggregates in each class. By reference to the average ratio, the total assessed value as reported by local assessors is adjusted to full true value, the resulting figure serving as the basis for the allocation of State aid and the distribution of the county tax burden.

The question is whether the average ratio thus determined may be used to deal with the problem of *intramunicipal* inequality. [at 26–27]

In *Bayonne v. Tax Appeals Division,* 49 *N.J.Super.* 230 (App. Div.1958), the court explained specifically how the school aid ratio is calculated:

The New Jersey Division of Taxation, by its Local Property Tax Bureau, screens all sales transactions reported to it by local assessors and county boards of taxation and makes determinations as to which sales are usable or non-usable on the basis of a list of 26 specified criteria (mortgages as part of consideration, family transactions, sales by public bodies, etc.). These determinations are necessarily summary in nature since almost 200,000 deeds are recorded each year and an attempt is made to screen as many as possible for usability. The sales transaction period used is the year beginning July 1 of the prior calendar year. Such transactions as are not screened by the cut-off date fixed each year for purposes of completion of the fixed ratios in time for promulgation of the tables on October first are not used.

The equalized valuations for each taxing district are determined by the Director on a "weighted" basis and are arrived at as follows. The usable sales

are divided into four classifications: vacant land, residential property of four dwelling units or less, farm land, and all other real estate (commercial, industrial, apartment houses, etc.). A separate ratio is determined for each of the four classes on the basis of the transactions in that class and an equalized aggregate valuation of all the real property in that class is determined by application of the class ratio to the aggregate assessed valuations of all property in that class in the taxing district. The total of the four aggregate equalized valuations for the four classes is determined by addition, and this is the operative figure for purposes of distribution of state school aid. The total of assessed valuations in the district is then divided by the total last mentioned, resulting in the final weighted average ratio for the district. This is the figure shown in column 2 of the table of equalized valuations (*N.J.S.A.* 54:1–35.2). [at 234–235]

*See, also, Kingsley v. Bayonne,* 89 *N.J.Super.* 549 (App.Div.1965).

Thus, the table for the year 1980 (fiscal school years 1981–1982) is promulgated by October 1, 1980. It is, of course, subject to revision in accordance with appeals from such tables by a taxing district pursuant to *N.J.S.A.* 54:1–35.4. A revised table is subsequently promulgated by the Division of Taxation. See *Annual Report of the Division of Taxation* for fiscal year 1980, at 393 *et seq.*

Inevitably, then, a critical question in discrimination actions was the issue of what school aid ratio shall apply—the ratio for the tax year or the ratio for the assessment year? No reported case has analyzed this issue in depth although some courts have simply applied the tax year school aid ratio and cited *Feder v. Passaic*, 105 *N.J.Super.* 157 (App.Div.1969), for the proposition.[4] The significance of *Feder* is actually the fact that the Appellate Division pointed out that occasionally certain statistical adjustments distort school aid ratios so that the courts are free to recompute the most probative average ratio for purposes of discrimination actions. *Id.*, 162–163.. The court never explicitly held that tax year ratios were the only ratios to be used, yet this case is cited as the bedrock of that proposition.

To further complicate the question of what ratio should be used in discrimination actions, in *Tri-Terminal Corp. v. Edgewater*, 68 *N.J.* 405, 413, n. 4 (1975), the Supreme Court used an

---

[4]*Kents* used tax year ratios without ever saying why. 34 *N.J.* at 27.

*unweighted* Director's ratio for 1971 of 58% in refuting the taxpayer's contention therein that the wide range of assessments to sales as shown in the Director's ratio studies demonstrated the lack of a common level. (The Director's weighted school aid ratio for 1971 was 73.18%.) The court held there was a common level and no substantially disparate treatment, and noted that:

> The central holding in *Kents* was that where there is no showing by the taxing district of a common level of assessment, the average ratio of the Director's sales ratio studies for the year in question for the particular municipality may be used as *prima facie* evidence of the level to which the true value of the property may be reduced if substantially greater than such ratio. *See* 34 *N.J.* at 31. [at 410; footnote omitted]

*Piscataway Associates, Inc. v. Piscataway,* 73 *N.J.* 546 (1977), found an absence of a common level but did so in a less than lucid manner in a situation like *Tri-Terminal,* where a taxing district simply carried prior revaluation values by uniformly multiplying them by a time adjustment factor. The court held that time had eroded the common level established by the revaluation made eight years prior to the year in question and that taxpayer's property was assessed at a percentage substantially greater than the Director's ratio.

The latest reported appellate court case concerning this issue is *Fort Lee v. Hudson Terrace, supra,* which, in the spirit of *Tri-Terminal Corp.,* held that the taxpayer failed to demonstrate the absence of a common level and that it was the recipient of substantially equal treatment vis-à-vis other taxpayers in the taxing district.

Against this confusing historical backdrop the Legislature, by adopting chapter 123, sought to rectify unfounded assumptions and the misapplication of various legal principles, as well as supplementing the letter and spirit of *Kents.*

The core of chapter 123 mandates that the average ratio to be used in actions grounded in discrimination "shall mean" the Director's school aid ratio (weighted except in 1978) as calculated pursuant to *N.J.S.A.* 54:1–35.1 for the year *preceding the tax*

*year* (emphasis added) as revised by the Division of Taxation. In short, the Legislature fully intended to reverse the principle, never fully explained by the courts, that the tax year school aid ratio shall be used in discrimination cases. It emphatically and mandatorily directed the appropriate tribunal to use the assessment (pretax) year school aid ratio as affected by judgments from appeals by taxing districts challenging the school aid ratio pursuant to *N.J.S.A.* 54:1–35.4.[5] The Legislature has taken this "chapter 123 ratio" and formulized the "substantially disparate treatment" element of *Kents* into a common level range or "corridor".[6] In short, the core of chapter 123 composes the essential statistical ingredients for a discrimination action. Thus, there is no basis to speak of discrimination actions in the alternative. Chapter 123 *relief* is not an alternative to the constitutional *right* to claim discrimination found in *Kents*, but it is an answer to Chief Justice Weintraub's plea for a legislative response to the dilemma of providing a remedy in "ratio cases." *Kents*, 34 *N.J.* at 33. In reality, parties alleging "constitutional" (conventional) discrimination, see n. 1, *supra*, are simply asking the court to apply the school aid ratio for the tax year pursuant to *Feder v. Passaic, supra* (or more remarkably, an unweighted

---

[5]This subtle yet utterly profound alteration of the law of discrimination recognizes the contentions of assessors who have consistently maintained that, as of the assessment date, the school aid ratios for the tax year were not available. They apparently succeeded in convincing the Legislature that the principle of stability of assessments through the use of that which is known as of the date of assessment, is paramount in our law.

[6]This construction is supported by *Piscataway Associates, Inc. v. Piscataway, supra* 73 *N.J.* at 554, n. 4. This is not to be confused with a coefficient of deviation. The coefficient of deviation is a most instrumental statistic in determining the existence of a common level. Since all ratios of assessments to market prices are not identical, it is useful to consider whether the ratios cluster around one focal point. That point is the average (mean) ratio. The variances from the mean of each individual ratio (assessments to sale) are also averaged to form a coefficient of deviation. Thus, the coefficient is a statistic which measures the degree of departure of all ratios (assessments to sale) from the average ratio. *Whippany Associates v. Hanover*, 1 *N.J.Tax* 325, 334 (Tax Ct.1980).

ratio). Parties alleging "chapter 123" (statutory) discrimination seek application of the *pretax year* ratio. But now, with the effectiveness of chapter 123, use of a tax year ratio is in contravention of the clear legislative mandate in terms of establishing a *prima facie* claim of discrimination.

Any argument concerning the exclusivity of chapter 123 can only be conceived as presenting an issue as to what ratio is to be used. The Legislature has declared that the assessment year (pretax year) school aid ratio shall be used. However, it must be emphasized that the Legislature, in enacting chapter 123, preserved the right of a party to rebut the presumption that the pretax year school aid ratio reflects the common level in the taxing district. In short, without more, the chapter 123 remedy, in the first instance, will be employed in determining the validity of discrimination claims. See Introduction to chapter 123, *Laws of* 1973, at 242, and Committee Statement attached to Assembly Bill 1492—*L.* 1979, *c.* 51, at 108.[7]

An explanation of the language referring to a rebuttable presumption can be found in *Tri-Terminal Corp., supra,* in its explanation of *Kents*:

> ... The average ratio of the Director's sales ratio studies for the year in question for the particular municipality may be used as *prima facie evidence* of the level to which the true value of the property may be reduced if substantially greater than such ratio. [at 410]

The *Tri-Terminal* court referred to *Kents* (*Kents* at 31) where it was stated that where there is no common level the average ratio (school aid) "should be *deemed* sufficient evidence of the level to which reductions should be granted in the absence of circumstances indicating that the average should be modified for that purpose. The trier of facts may properly consider any weakness which may appear, as, for example, a paucity of sales in the municipality or some imbalance caused by unusual experi-

---

[7]The statement provides that the average ratio be used for the purpose of establishing a rebuttable presumption relating to cases of alleged discrimination.

ence." · This passage is deftly illustrated by *Feder v. Passaic, supra* at 163, where the court rearranged the Director's school aid ratio for the year in question. Additionally, it is conceivable that a party could demonstrate that a common level exists as reflected by the unweighted ratio study for the year in question. In short, the presumption of discrimination in accordance with the chapter 123 ratio can be rebutted by a party in any manner demonstrating a common level notwithstanding the chapter 123 ratio.

This aspect of the statute takes on added importance when it is noted that the 1980 chapter 123 ratio which is certified on April 1, 1980 is based on a study covering the period July 1, 1978 through June 30, 1979. The 1980 school aid (*Feder*) ratio is promulgated on October 1, 1980 and is based on a study covering the period July 1, 1979 through June 30, 1980. The use of the ratio based on the more current period may be more probative of assessing practices in a particular taxing district where peculiar circumstances have caused rapidly fluctuating property values during the latter study period.

The only reported case dealing with the use of the chapter 123 remedy in a detailed manner is *Murnick v. Asbury Park*, 2 *N.J.Tax* 168 (Tax Ct.1981). There the court was confronted with the question of determining the appropriate ratio to be used for the 1978 tax year—the first year of chapter 123 application. It is significant to note again that in 1978 the chapter 123 ratio was unweighted and was thus not truly the pretax year (1977) school aid ratio. *See* n. 3 *supra*. The court applied the weighted tax year ratio and yet noted at 178 "However it is unnecessary for this court to decide exclusivity." The result is consistent with the foregoing analysis since the case can be construed to mean the presumption of chapter 123 was rebutted in view of the court's language that "I find that in the context of the present matter, Chapter 123 fails to provide an adequate and equitable remedy as contemplated by the

Supreme Court of New Jersey in *In re Appeal of Kents, supra*."
At 191.

Still to be considered is the effect of chapter 123 on *Matawan*.
In view of the foregoing, however, the answer is obvious.

■ Both *N.J.S.A.* 54:3–22 and *N.J.S.A.* 54:2–40.4 are clearly
mandatory. Those sections of the statute state that the county
tax board and the Tax Court "shall revise" and "shall enter
judgment" as to the taxable value of the property.

■ This language is in stark contrast to that found in
*N.J.S.A.* 54:2–35, the provision critical in the *Matawan* case.
That statute is clearly permissive in view of its use of the phrase
"may give such judgment," *Leeds v. Harrison*, 9 *N.J.* 202 (1952),
and the general import of the provision in its entirety as
construed in the context of the whole legislative scheme. The
word "shall" is not conclusive that an enactment's purpose is
mandatory, but if a public right or public benefit ensues from
such a construction, then the provision is mandatory. *Franklin
Estates, Inc. v. Edison*, 142 *N.J.Super.* 179 (App.Div.1976), aff'd
73 *N.J.* 462 (1977). Stated differently, such a mandatory con-
struction is warranted where the essential spirit, *e. g.*, the
underlying purpose, of the enactment is served. *Durgin v.
Brown*, 37 *N.J.* 189 (1962). Accordingly, this court holds that
the above-mentioned provisions are mandatory, especially in
view of the principle that

> Where the legislature has comprehensively addressed an area of the law, it
> must be assumed that it meant what it wrote since, in construing a tax statute,
> significance must be ascribed to clearly intelligible and declaratory words of the
> statute and it must be assumed that they were used purposely. [*Wilentz v.
> Hendrickson*, 133 *N.J.Eq.* 447 (Ch.1943), aff'd 135 *N.J.Eq.* 244 (E. & A.1944)].

Chapter 123 undeniably bestows a benefit on the public in
terms of relieving all litigants of a perceived burden in cases
involving real property tax discrimination. It also buttresses
the fundamental, cardinal principle of taxation—stability of
assessments. Thus, a mandatory construction is apparent. This

alteration of the available remedies in the field of discrimination is clearly at odds with the *Matawan* limitation.

By establishing a common level range the Legislature profoundly altered "the remedies made available for relief from excessive or inadequate assessments," *Matawan* 108 *N.J.Super.* at 119. While the court in *Matawan* found that the then current scheme demonstrated that "the legislature intended that changes in the amount of the assessment were not to be made after the tax lists had been reviewed, approved and returned by the board," *ibid.*, such is not the case here.

Chapter 123 mandates the tribunal to apply the average ratio or the county percentage level if it finds that the ratio of the assessment to true value of the subject property exceeds or falls below the common level. *See Venino v. Carlstadt*, 1 *N.J.Tax* 172 (Tax Ct.1980). Hence, in an appropriate case the county tax board or court must increase the assessment beyond the original assessment if it finds that the ratio of the assessed value is below the common level range.

The unequivocal language of *N.J.S.A.* 54:2–40.4(a) and *N.J.S.A.* 54:3–22(c) states that when either the Tax Court or the county tax board

... is satisfied by the proofs that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall revise the taxable value of the property by applying the average ratio to the true value of the property....

This aspect of the statute does not entitle a taxpayer to assume that the assessment cannot be challenged as too low if there is no municipal appeal. Consequently, commencing from the effective date of chapter 123, taxpayers are put on notice that the assessment of their property can be increased under certain circumstances without the presence of a municipal appeal from the original assessment in actions grounded in discrimination. Such was the case here, and the taxpayer cannot successfully argue that the county tax board acted without authority. Accordingly, plaintiff's motion is denied.