KAHN, J.T.C.
This is the court’s determination involving a real estate property tax appeal made directly to the Tax Court for the years 1994 and 1995, the relevant assessment dates being October 1, 1993 and October 1, 1994. No answer or counterclaim was filed by the municipality. The assessment for each year in question is:
Land $ 922,500
Improvement 182,500
Total $1,105,000
The subject property is located in the City of Englewood, known as 120 S. Woodland Street (Block 3202, Lot 8), in an area frequently referred to as “Englewood’s East Hill.” The parties acknowledge this area to be a prestigious, desirable location consisting of large homes on substantial wooded lots. This location is a short distance from New York City, and is near schools and transportation. In this area are located many older homes similar to the subject as well as newly constructed mansion-type homes.
The subject land totals 3.10 acres. The house thereon, constructed in and around 1921, consists of 4,128 sq. ft. of living area. The appraisal experts differ as to certain details, which differences do not seriously affect the outcome but should be noted for the record. The taxpayer’s appraisal expert states that the basement totals 1,905 sq. ft., which includes 630 sq. ft. of fair quality finished *539 space. The municipality’s expert witness indicates merely that the basement is full and finished with a family room and bathroom.
Taxpayer’s witness indicates that the living area consists of nine rooms, including four bedrooms, three full baths, and one-half bath. His description also includes a screened open porch, a two-car carport, an in-ground swimming pool, a cabana, and an old abandoned garage which he describes as being in poor, unusable condition. The municipality’s expert counts twelve rooms, including five bedrooms, four full bathrooms and one-half bath, as well as a two-car basement garage. Both describe the overall condition as “fair” and both indicate substantial deferred maintenance or functional obsolescence.
The land is irregularly shaped as demonstrated by copies of the plot plan referred to in the appraisal reports.
The taxpayer’s appraisal expert utilizes solely a market sales approach, citing four comparable improved sales for use in determining value as of October 1,1993 for the 1994 tax year and three comparable sales for the 1995 tax year. The four comparables utilized for 1994 were all located in the City of Englewood, specifically the “East Hill” area. The witness utilized the sales prices for each of the four comparables and made adjustments for numerous criteria in order to arrive at value for the subject. Sale No. 1, for example, took place in April 1993, sale No. 2 in August 1993, and sales Nos. 3 and 4 in September 1993. The witness made no adjustments for time. The sales prices range from a low of $730,000 (comparable No. 3) to a high of $1,000,000 (comparable No. 1). The expert’s most significant adjustments in terms of amount involves lot size (with respect to the land), quality (referring to construction) and condition (also referring to both exterior and interior construction). The last two of these criteria also include functional utility. He also made adjustments for location (comparable No. 3), finished attic (comparables 3 and 4), garage and garage house (comparable No. 3), in-ground pool (comparable No. 2), finished basement (comparable No. 3), fireplaces (all *540 comparables), and central air conditioning (comparables 1, 2, and 4).
The result of these adjustments resulted in four adjusted sale prices from a low of $731,000, to a high of $803,025, from which the witness concluded a valuation of the subject property as of October 1,1993 in the amount of $750,000.
Comparable sales 5, 6, and 7 utilized as comparable sales for the year 1995 (assessment date 10/1/94) also were located in the East Hill area. The witness performed the same analysis with the same type of adjustments from which he found three adjusted sale prices with a low of $690,000 and a high of $752,500. He concluded that the value of the subject property as of 10/1/94 was $735,000.
The essence of the witness’s analysis appeared to be that the subject improvements were not in good condition and were not desirable as compared to other properties. For example, he cited that the kitchen consisted of three separate small rooms. He indicated that the subject did not have a fireplace, unlike each of the comparables, and that a prospective purchaser, willing to spend substantial monies, would require one. He cited lower ceiling heights in the subject property than in the comparables. His view of the subject indicated that no actual master bedroom or bath existed. He also indicated that at least one bathroom was accessible from two different bedrooms. In addition, the property contained a swimming pool and a garage that were not in usable condition. Some of his adjustments with respect to the improvements were located in the witness’s quality and condition adjustments, which when combined, formed substantial reductions from the comparable sales prices to reflect the diminished value of the subject.
On cross examination, the witness was asked to translate his percentage adjustments into dollars. The witness performed numerous calculations as requested by the municipality’s attorney which resulted in varying prices per square foot costs dealing with each adjustment. The witness testified that his analysis was not based on sales derived from the marketplace, only from his own *541 expertise. The witness indicated that his percentage lot size adjustments, when converted to dollar adjustments, varied from approximately $19,000 per acre to $75,000 per acre, depending upon which specific comparable sale was discussed.
With respect to comparable No. 7, it was revealed on cross examination that the purchasers demolished the house and have either erected a new house or are in the process of doing so. Apparently the sale took place in June 1994 and within several months the purchasers began the processes of obtaining permits for the erection of a one-family home. The witness treated this sale in the same manner as his other comparable improved sales and did not consider that the property’s selling price might have been attributed solely to the land value.
The municipality’s expert witness cites the nearly 100% development of the area as being responsible for creating little or no vacant land for development. The witness testified that the current improvement approximately seventy-five years of age is so functionally obsolete as to have no value in the marketplace. He cited specifically the second floor layout and the kitchen which is divided into several small rooms. Both expert witnesses agree that the house has no central air conditioning or fireplaces; both acknowledge that the swimming pool is currently unusable as is the garage.
The municipality’s witness contends that the improvements on the subject property have no value. Indeed, treating the land as if vacant causes it to be more valuable than the property as currently improved. In support of his position, the municipality’s appraisal expert utilizes seven comparable sales which he describes as “vacant land sales” because subsequent to six of the sales, the improvements were demolished and permits were applied for and/or approved for new construction. The seventh sale was a vacant lot of .8 acres which was subdivided from a larger lot and, therefore, did not require demolition of an existing improvement. For the six sales that involved demolition, defendant’s witness adjusted for demolition costs, topography, and land size in order to arrive at a per acre value. He also adjusted for zoning, *542 recognizing that the subject was in a RAAA zone (two acre minimum) and some comparables were located in a one acre minimum and two of the properties were non-conforming uses of less than one acre.
Three of the comparables, namely No. 2, No. 5 and No. 7, appeared to be most comparable and contained few adjustments. Comparable No. 2 involved 1.90 acres and sold in June 1991 for $1,288,470 with the same zoning (RAAA — two acre minimum) as the subject. No adjustments were made by the municipality’s expert and he arrived at a per acre cost of $444,310. Comparable No. 5 sold on February 25,1994 for $912,000 and consisted of 3.30 acres. He adjusted the sale upwards fifteen percent' because it was an estate sale as opposed to usual market conditions. The adjusted per acre price was $317,817. Comparable No. 7, which sold June 13,1995 for $1,127,800, consisted of 2.29 acres located in the same zone as the subject. The witness only adjusted the comparable ten percent downward because the subject lot consisted of approximately % of an acre more than the comparable. The adjusted per acre value was $443,130 and the location of these three comparables is in the same East Hill section as the subject and were surrounded by the same type of larger homes as the subject. From these seven comparables, with greater emphasis on comparables No. 2, No. 5, and No. 7, the witness concluded that the value of the subject property as vacant land for both relevant assessment dates should be $400,000 per acre totaling $1,240,000 with no value attributed to the improvements.
The witness also attempted a comparable sales analysis of improved property which resulted in an opinion that the subject, as improved property, should be valued at $1,000,000. He cited three improved sales, again located in the East Hill section; one of which (comparable No. 2) was located on the same street as the subject. Comparable No. 2 involved a sale in June 1993 for $1,300,000. The lot size is 2.13 acres and the living space in the improvement 5,024 sq. ft., consisting of six bedrooms and four and a half bathrooms. There were three fireplaces, a fully finished basement, central air conditioning, and an attached two-car ga *543 rage. The witness rated the improvement as fair for its age. He made adjustments in the main in a downward fashion with respect to the improvement. He rated the condition of the comparable better than the subject. There was 1,000 sq. ft. more of living space than in the subject and the comparable contained one more bathroom, three fireplaces, and central air conditioning. The result of this comparison produced an adjusted value of $1,228,000. Using the same technique, comparable No. 1 produced an adjusted value of $876,600 and comparable No. 3 produced an adjusted value of $1,032,500. It should be pointed out that the witness adjusted each of the three comparables for the size of the land. In these improved sales the adjustment for size amounted to $250,000 per acre, indicating that dealing with improved sales differences in lot size between the comparable and the subject should be adjusted for an amount less than the witness’s per acre opinion for vacant land. In other words, he states that as improved property the extra land does not have the same value as if the land were vacant.
This court must consider whether or not the value of the subject land in a vacant condition is greater than its value as currently improved, which is essentially a highest and best use consideration. Caulfield v. Surf City Bor., 14 N.J.Tax 118 (Tax 1994). The taxpayer’s evidence points to seven improved sales, one of which involved a subsequent demolition. Both experts determined that the improvements on the comparables were superior in quality and condition to the subject improvements producing a substantial downward adjustment. The testimony from both sides detailed the absence of functional utility of the subject improvements as well as a lack of amenities normally required by prospective purchasers of residences in the subject area.
This court finds that the more reliable testimony was that of the municipality’s expert. He utilized a total of ten comparables, although seven of them were termed vacant and three were termed improved. Three of those “vacant” sales, as aforesaid, were very similar in all aspects requiring few, if any, adjustments. Those three sales alone indicated a value of $400,000 per acre *544 when rounded. The comparables utilized by the municipality’s witness best reflect the market for property as vacant.
This court also does not adopt the taxpayer’s appraiser’s view as to the proper adjustment for differences in lot size. His percentage adjustments reflected a range of $19,00,0 to $76,000 per acre. Since property is purchased and sold based on dollars, this result is unreliable. The East Hill area of Englewood consists of mostly larger lots and few, if any, are available in a vacant condition. The lack of supply creates a major demand. This court determines the municipality’s expert witness’s comparable sales approach demonstrates a much more realistic price per acre than that opined by taxpayer’s witness. The municipality’s witness refined his opinion by utilizing an improved comparable sales approach hereinabove discussed. The methodology, however, resulted in an adjustment for differences in lot size in the amount of $250,000 per acre, which is useful as a consistent adjustment factor.
The one area in which this court does not follow the municipality’s expert’s opinion is with respect to the irregularity of the property, which he feels does not require adjustment. The narrow strip of the subject lot, which amounts to approximately Ho of an acre is in the back of and out of the way, its value, per acre, is less than the value of main area of the property. This was not taken into consideration. Accordingly, the adjusted $400,000 per acre should be related to 2.7 acres consisting of the main usable area. The approximate Ho of an acre should be valued as excess with limited utility based upon the municipality’s witness’s estimate of $250,000 per acre, which amounts to $80,000 for that excess portion. This court, therefore, finds the value of the subject land, as of both relevant assessment dates, to be $1,160,-000. No value is to .be attributed to the improvements, and no consideration is to be given to the cost of demolishing same. This cost, if borne by the purchaser, would be received by a third party, not by the. seller, as consideration. The municipality has successfully demonstrated by a preponderance of the evidence that the *545 highest and best use of the subject property is as vacant land as opposed to land as currently improved.
For 1994, although this court finds true value ($1,160,000) to exceed the assessment ($1,105,000), the assessment must be affirmed. 1994 is a revaluation year, not governed by Chapter 123 of the Laws of 1973, N.J.S.A. 54:51A-6(d). Our Supreme Court in F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 495 A.2d 1313 (1985) specifically dealt with the rights of a municipality to obtain an increase in assessment where no affirmative claim for relief is filed.
The Court recognized that some cases were brought on the basis of discrimination under N.J.S.A 54:51A-6 (chapter 123 of the Laws of 1973), and others on the basis of erroneous calculation or otherwise not on the basis of discrimination (chapter 123 inapplicable).
With respect to discrimination cases, the Supreme Court stated:
Cases involving claims that an assessment has been set discriminatorily, compared with the common level of assessment in the district, have consistently allowed the County Tax Board or court to increase an assessment even in the absence of a timely appeal by the municipality. See, e.g., Weyerhaeuser Co. v. Borough of Closter, 190 N.J.Super. 528 [464 A.2d 1156] (App.Div.1983); Fort Lee v. Hudson Terrace Apts., 175 N.J.Super. 221 [417 A.2d 1124] (App.Div.), certif. den., 85 N.J. 459 [427 A.2d 559] (1989); Devonshire Development Assocs. v. Hackensack, 2 N.J.Tax 392, 184 N.J.Super. 371 [446 A.2d 201] (Tax Ct.1981). Permitting increased assessments in these cases can be explained by the overriding policies involved in such a case. A charge of discrimination implicates the constitutional right to equal protection of the law. In re Appeal of Kents 2121, Atlantic Ave., Inc., 34 N.J. 21 [166 A.2d 763] (1961), and is the subject of particular legislative concern, see N.J.S.A. 54:3-22 (so called Chapter 123; imposing on Tax Court and county board obligation to revise assessment when value ratio is outside statutory common level range); Murnick v. Asbury Park, 95 N.J. 452 [471 A.2d 1196] (1984); Weyerhaeuser, supra, 199 N.J.Super. 528 [464 A.2d 1156].
[F.M.C. Stores, 190 N.J. at 428, 495 A.2d 1313.]
In Rabstein v. Princeton Tp., 187 N.J.Super. 18, 453 A.2d 553 (App.Div.1982), the Appellate Division was concerned that taxpayers would benefit by an error in their favor by reason of a municipality’s neglect in failing to counterclaim, thereby giving taxpayers preferential treatment. The Supreme Court in F.M.C.
*546 Stores distinguishes between discrimination and nondiscrimination cases as follows:
The arguments advanced by the municipalities overlook the point that the legislation prescribes a carefully structured procedural framework for resolving tax disputes and required strict adherence to the statutory plan. The statutory scheme itself strikes the balance between the ultimate and general fairness that is achieved when government acts conscientiously and properly in accordance with the statutory standards and the apparent fairness to an individual taxpayer that is achieved in a particular appeal.
Additionally, the municipalities ignore the basis for the disparate treatment with which courts and the Legislature have regarded discrimination claims and those based on erroneous calculations of value. The goal of fixing assessments at precise true value “is rarely met uniformly throughout a taxing district.” Weyerhaeuser, supra, 190 N.J Super, at 532 [464 A.2d 1156].
[F.M.C. Stores, 100 N.J. at 429, 495 A.2d 1313.]
The Court concludes:
As we held in Pantasote, [v. City of Passaic, 100 N.J. 408, 495 A.2d 1308 (1985) ], the Tax Court is required to invest the municipal assessment with the presumption of validity. It may not disregard that presumption unless the taxpayer itself has adduced cogent evidence that serves to overcome it. Absent such countervailing testimony, or the factors we deemed relevant in Pantasote, it would be an abuse of discretion to increase the assessment without a proper pleading affirmatively seeking such relief.
[F.M.C. Stares, 100 N.J. at 431, 495 A.2d 1313.]
This court finds that since the municipality did not file a counterclaim in this action for the 1994 tax year in response to plaintiffs complaint, no increase in assessment is permitted. The assessment of $1,105,000 is, therefore, affirmed.
For 1995, as previously discussed, no counterclaim was required. Chapter 123 provides the mechanism to permit an increase in assessment if applicable. In this case, however, this court’s finding of true value is within the common level range. The average ratio for 1995 is 96.17. The upper limit of the common level range is 100% and the lower limit is 81.17%. The ratio of the assessment to this court’s finding of true value is 95.26%, and is within the common level range.
With respect to the allocation of the assessment as between land and improvement, this court has already determined that the most reliable expert testimony demonstrates that the value of the subject property is based solely on its vacant land value for *547 development being greater than the land as currently improved. N.J.S.A 54:4-26 as well as N.JAC. 18:12-2.8b, however, require at least nominal value designated for improvements.
Judgment shall be entered as follows:
1994
Land $1,104,900
Improvement _100
Total $1,105,000
1995
Land $1,104,900
Improvement 100
Total $1,105,000