NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

TAX COURT OF NEW JERSEY



**Mala Sundar**
 **JUDGE**

R.J. Hughes Justice Complex
P.O. Box 975
25 Market Street
Trenton, New Jersey 08625
Telephone (609) 815-2922
TeleFax: (609) 376-3018
taxcourttrenton2@judiciary.state.nj.us

February 23, 2018

**BY FIRST-CLASS MAIL**
Frank J. Kenny, III, Self-Represented
Toms River, New Jersey

**UPLOADED**
Kenneth Fitzsimmons, Esq.
Toms River Township Division of Law
33 Washington Street
Toms River, New Jersey 08753

> Re:    Kenny v. Township of Toms River
> Block 1462.14, Lot 17 (1821 Starboard Court)
> Docket No. 010978-2017

Dear Mr. Kenny and Counsel:

This letter constitutes the court's decision following trial of the above captioned matter. Plaintiff owns a residence, the above-captioned property ("Subject") in defendant ("Township"). For tax year 2017, the Subject was assessed at $315,000 (allocated $205,900 towards land value, and $109,200 towards improvement value).

By judgment dated June 14, 2017, the Ocean County Board of Taxation ("County Board") affirmed the assessment using judgment code 2A ("assessment within range (N.J.S.A. 54:3-22)"). Plaintiff then filed a complaint to the Tax Court claiming that the assessment should be reduced to the amount allocated to land value only since the building was damaged by Superstorm Sandy, and is not yet habitable.

*

Testimony revealed that the Subject had two bedrooms and two baths, with a total gross living area ("GLA") of 1,683 square feet ("SF"). The house is on a concrete slab, and has an attached garage. Plaintiff inherited the Subject from his mother, who owned it until passed in June of 2016.

For tax year 2012, the Subject's assessment was set at $373,000 (due to an appeal). The Subject was damaged in 2012 by Superstorm Sandy. Its assessment was therefore reduced pursuant to the guidelines of percentage decrease issued by the Division of Taxation. For tax year 2013, the improvements were depreciated down to $10,600, which with the value allocated to land of $205,900, produced an assessment of $216,300. The same assessment continued for tax years 2014 and 2015.

The assessor inspected the Subject in November of 2015, which showed that while the house needed some more work, it was habitable. He therefore provided a 15% negative adjustment for improvement, and imposed an assessment of $292,100 (allocated $205,900 to land and $86,200 towards improvements). On August 8, 2016, he re-inspected the Subject and found the dwelling to be habitable despite minor repairs being needed. He therefore increased the value of the improvements to $109,200. This, with the value allocated to land of $205,900 produced an assessment of $315,100 for tax year 2017.

Plaintiff contended that since he is still battling with State agencies on obtaining funding for repairs/renovations of the Subject, which includes its elevation, the value of the improvements should be zero. Paperwork submitted by plaintiff shows that his mother had initially applied for funds to repair the Subject. Based on this application, on March 20, 2017, plaintiff entered into an agreement with the New Jersey Department of Community Affairs whereby he was awarded a

grant from its "Low-to-Moderate Income Homeowner Rebuilding Program" (LMI).[1]  Pursuant to the agreement, plaintiff certified that "all new construction and substantial improvements to the [Subject] will be elevated to one foot above base flood elevation, or higher according to local ordinance, whichever is more restrictive . . . within" a year of the award, unless that time was extended.  Plaintiff also undertook, as part of the agreement, that he would "complete the [Subject] to occupancy as evidenced by a certificate of occupancy and must satisfy" the elevation requirements,[2] and would maintain flood insurance on the Subject "for the life of the structure."

A "Homeowner Award Calculation" sheet, also dated March 20, 2017, showed that plaintiff would receive a total of $165,000 for "rehabilitation" of the Subject.  The total cost, based on reports in this regard, was $391,352.22.  This included costs for "total completed repairs" ($188,440.79, of which $812.28 was deemed "ineligible"); "cost to complete" ($5,132.32);[3] and "elevation cost" ($197,779.11).[4]  Plaintiff was awarded only $165,000 (which was the "program cap" of $150,000 plus 10% retainage of $15,000), and was responsible for the balance ($187,911.43).  Plaintiff signed a "Sufficient Funds Acknowledgement" form which stated that he was "aware" that the estimated total cost to complete rehabilitation was "$202,911.43," and that he received a grant of $150,000 from the LMI Program.

---

[1] The LMI program was funded by the U.S. Department of Housing and Urban Development's "Community Development Block Grant – Disaster Recovery Program," to assist States like New Jersey which were impacted by Superstorm Sandy.

[2] By a letter dated November 2, 2016, an individual who was the "Storm Recovery Ombudsman" from the Township's Department of Engineering and Community Development wrote to plaintiff that it had provided plaintiff with "the forms necessary to secure your Zoning Approval and [had] reviewed [with plaintiff] the process to secure building permits for this 'Elevation.'"

[3] This was the number provided by a contractor on September 17, 2015.  That estimate also included a "cost to repair" certain portions of the interior (bathroom, den, garage, and kitchen) for a total of $5,132.32; and "mobility modification costs (wheelchair platform lift to 8 feet height) of $18,630

[4] See supra n.3.

A site plan depicting the elevation, construction of an open deck, an elevator and landing area, dated March 31, 2017, was prepared for the Subject. This showed a sketch of the Subject "to be elevated to Fl. EL. 15.93." The map indicated that the "proposed improvements are limited to building additions as noted," with no changes to grading, drainage, or utility connections. Architectural plans dated February 10, 2017, were also prepared (the court was provided a "Title Sheet" of an architect's "proposed floor mitigation and alterations").

Plaintiff claimed that the home was only 89% finished since it still needed to be elevated, for which sheetrock needed to be removed and heating coils needed to be installed. He claimed that the kitchen needs to be gutted, other rooms would also require work, and air-conditioning was not "hooked up." He indicated that the unfinished state of the Subject had caused him to incur a citation for safety code violations by notice dated October 5, 2016, which had cited plaintiff for "outdoor storage of materials" which was "prohibited." Another such notice dated June 17, 2017, listed five violations, one for "outdoor storage of materials," and the other four for a shed (no permit, unsafe location being "too close" to the lagoon, property lines, and street).

Post-trial, plaintiff submitted a letter dated January 22, 2018, from an electrical HVAC contractor that the company had installed a central air conditioning system "complete with duct work and related equipment for a working system," but "is not wired for operation." Plaintiff also submitted grainy black-and-white copies of pictures of the Subject which appears to be part of an environmental report authored by McCabe Environmental Services, L.L.C., dated September 21, 2015, for Shaw Environmental & Infrastructure, Inc., regarding the Subject, in connection with plaintiff's mother application (identified as "Applicant No.: LM10001806"). Plaintiff handwrote notes on these pictures as to what needed to be done to various parts of the house (interior and exterior). Thus, on a picture identified as the Kitchen, plaintiff wrote: "Whole kitchen needs to be

4

remove (sic); No microwave; Stove not hook up; Floor needs to be remove (sic)." On the picture identified as the Den, he wrote: "Hot water baseboard need to be remove (sic); Floor needs to be remove (sic)." On a picture identified as the Garage, he wrote: "Hotwater baseboard boiler need to be remove (sic); Hot water heater need to be remove (sic)." On the pictures of the exterior, he noted the location (such as side, front, or back), and on a picture identified as Side B of House, he wrote "new A/C never hook up see letter & other picture." On another picture of an exterior portion, which plaintiff identified as "A/C outside 1-22-2018," he wrote "A/C Elec Never Hook Up!! * Note See Letter." On a picture identified as the Bathroom, he wrote "Note not Handicap." On a picture of the exterior, plaintiff wrote "1-22-2018 Back Yard; Stone walk way; broke up on side; Stone Wall on Skid; Stone Wall Skid; Fence on Skid." On another picture of the exterior, he noted, "Side of Home gasline to be remove (sic); Sprinkler to be remove (sic)." On a picture he identifies as "Front Side," which shows what appears to be material covered by tarpaulins, he wrote "outdoor fixtures chairs tables; supply to raise" the Subject. On a picture plaintiff identifies as "Master Bath," he wrote "1-22-2018 Master Bath Needs HUD Handicap Bars; Tub Fixture Not Hook Up; No grab bars; Need Handicap Lift; Master shower Lip Needs to Remove for Handicap."

Plaintiff included two pictures which were very dark, one showing "MONDAY" on the top portion of the picture, and "2016.SEPTEMBER.26/3.26 PM" at the bottom. The other showed what appears to be portion of the exterior with debris and four-by-fours, captioned "MONDAY" on the top, and "2016.SEPTEMBER.26/3.27 PM" at the bottom. There are no other captions or indications identifying the same as the Subject. He stressed that there were still "<u>open</u>" building

permits from the Township, and the Subject's repairs was an "open project" under the LMI Program.[5]

Plaintiff, who resides (and for the tax year, resided) at a rental place, testified that post-Superstorm Sandy, he continued with making repairs to the Subject, added a new air-conditioning unit, and redid the kitchen and other rooms. He stated that he continues to reside at the rented place because the Subject is being renovated, and that he is receiving rental assistance from the government, as part of the Sandy rehabilitation efforts. He further stated that his mother, until she passed, only spent the day (9 a.m. to 3 p.m.) at the Subject and napped on her "lazy boy" but "never slept at" the Subject after it was damaged by the storm. Instead, she stayed with plaintiff at 15 Lagoon Drive West, Toms River, "till the day she passed." He testified that the house was powered with the necessary utilities while his mother spent the day at the Subject.

**ANALYSIS**

*(A) Validity of Assessments*

The assessment of real property for local property tax purposes is a statutorily mandated annual exercise. An assessor must "after examination and inquiry, determine the full and fair value of" real property "at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1" of the year prior to the tax year. N.J.S.A. 54:4-23. In this connection, an assessment should reflect a value that "is based upon the actual condition of the property as of the date of assessment." Russo v. Borough of Carlstadt, 17 N.J. Tax 519, 523 (App. Div. 1998).

---

[5] Plaintiff also filed an extension request under the LMI Program, on or about September 25, 2017, wherein he noted that there was no certificate of occupancy for the Subject and he was experiencing financial and personal hardships in completing the Subject's rehabilitation. He noted that he would need six-to-eighteen months to complete the various stages of rehabilitation, but had done a "ripout" of the landscaping, and expected the project to be completed as of October 29, 2019.

If a property's condition is negatively impacted after the assessment date due to certain events, such as a storm, then, our statutes allow a recognition for the same in the assessment, provided the assessor is timely notified. N.J.S.A. 54:4-35.1 provides that where a building "has been destroyed, . . . , or altered in such a way that its value has materially depreciated, . . . by the action of storm . . . , which depreciation of value occurred after October 1 in any year and before January 1 of the following year," the assessor must determine the post-damage value as of January 1 of the tax year provided he or she receives notice of the damage before January 10 of the tax year.

Here, the assessor lowered the Subject's assessment in 2013 to account for the damaged condition of the improvement. He continued to place this reduced value for 2014 and 2015 as reflected in their respective assessments. Thereafter, and pursuant to his personal inspection, he increased the value allocated to improvements due to the repairs being done to the Subject, first for tax year 2016, and then for 2017, because he deemed the repairs rendered the Subject habitable as of October 1, 2016. The issue therefore is, whether the 2017 affirmed assessment which was increased due to the assessor's determination that the Subject was habitable with new additions to the improvements, is presumptively correct.

Plaintiff's argument is primarily that the house has to be elevated, and until elevation is completed, it cannot be occupied, thus, no value can be ascribed to the improvements. The court is not persuaded. First, plaintiff's agreement under the LMI Program evidences that about $186,000 was already expended on repairs for the Subject. Second, plaintiff acknowledged that considerable repairs were also completed at the Subject. There was nothing to show that the house lacked any utilities (heat, power, water, or telephone) as of the assessment date. The fact that the air-conditioning unit was not "hooked up" does not mean that the house is not fitted for the same.

Nor was there any proof as to the non-functioning of any room such as bathrooms or kitchens. There was no allegation or evidence that the Township required plaintiff to obtain a certificate of occupancy to reside at the Subject as of the assessment date. Nor was there no evidence that the Township required the Subject to be demolished (by labeling it as unsafe for occupation), and then required the Subject to be elevated under its zoning regulations.

More importantly, there is no information whether the market would pay only the land value for the Subject due to the condition of the improvements (keeping in mind that plaintiff repaired the Subject, and per the LMI Program agreement, had already expended about $180,000 for this purpose). The barely discernable photographs do not evidence that the Subject's exterior or interior was in a pitiable state of destruction, such that the improvements could be said to attribute no additional value to the land.

That plaintiff has to elevate the Subject as a condition to the grant under the LMI Program, does not render the improvements worthless. What the court needs is some objective evidence which would assist in determining the Subject's value as of the assessment date of October 1, 2016. Plaintiff could have provided some initial evidence, such as for instance, comparable sales of homes in the neighborhood or competing neighborhoods, to show that sale prices were primarily for the land value due to the condition of the improvements similar to the Subject. See e.g. Appel v. City of Englewood, 15 N.J. Tax 537, 541, 543 (Tax 1996) (accepting the expert's opinion, which was based on factual data, that the older, more obsolescent, functionally inutile home should be treated as having "no value," thus land must be treated "as if vacant" since it is "more valuable than . . . as currently improved," and noting that the "court must consider whether or not the value of the subject land in a vacant condition is greater than its value as currently improved, which is essentially a highest and best use consideration"). Evidence could also have been in the form of

one or more sales of a residences which were not elevated after repairs to the Sandy-damaged portions, and one or more sales of residences which were so elevated, from which the court could surmise that the market would pay more or less for this physical characteristic.

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, L.L.C. v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). Therefore, "the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985). "The presumption . . . stands, until sufficient competent evidence to the contrary is adduced." Township of Little Egg Harbor v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). If a party has not met this burden, the trial court need not engage in a further evaluation of the evidence to make an independent determination of value. If, however, the presumption of correctness is overcome, the court must determine the value "based on a fair preponderance of the evidence" provided by "both parties." Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992).

The court finds that based on the facts here, plaintiff has not met his burden of proving the incorrectness of the County Board's judgement. It is true that this court is assigned with appraisal expertise. Nonetheless, its "independent assessment" depends "on the evidence before it and the data that are properly at its disposal." F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 430 (1985). See also Greenblatt v. City of Englewood, 26 N.J. Tax 41, 56 (Tax 2010) ("[a]n appropriate value and tax assessment, however, can only be deduced when there is sufficient substantial and competent evidence in the record to support that determination"). Without qualitative and quantitative factual data, or other evidence, the court cannot independently decide the value of the Subject. Allegations of the house not being habitable, without more, does not

equate to proof that it is worth $0. Since there was nothing provided which would assist this court to determine the Subject's value, it is compelled to dismiss plaintiffs' complaint.

## 0CONCLUSION

For the aforementioned reasons, the court affirms the County Board's judgment.

Very truly yours,

*Mala Sundar*

Mala Sundar, J.T.C.
