

TAX COURT MANAGEMENT OFFICE
(609) 815-2922

P.O. Box 972
TRENTON, NJ 08625-0972

# Corrected Opinion Notice

**Date: April 10, 2019**

**Joseph Pojanowski, III, Esq.**
Bertone Piccini LLP
777 Terrace Avenue
Suite 201
Hasbrouck Heights, NJ 07604

**Joseph McGlone, Esq.**
O'Toole Fernandez Weiner Van Li
14 Village Park Road
Cedar Grove, NJ 07009

**From: Shannon Tremel**

**Re: 691 Pompton Avenue Realty v Township of Cedar Grove**
**Docket number: 001513-2013; 000653-2014**

The attached corrected opinion replaces the version released on February 15, 2019  The Opinion has been corrected as noted below:

In the second full paragraph on page 6 (starting "As to the marketing…"), the final sentence doesn't end in a period.  Correction made to change the comma to a period.



**CHRISTINE M. NUGENT**
JUDGE

153 Halsey Street
Gibraltar Building - 8TH Floor
Newark, New Jersey 07101
(973) 648 – 2098 Fax: (973) 648-2149

February 15, 2019

**Revised 4/10/2019-comma corrected to a period; page 6, 2nd paragraph**

Joseph A. Pojanowski, Esq.
Bertone Piccini LLP
777 Terrace Avenue, Suite 201
Hasbrouck Heights, New Jersey 07604

Joseph J. McGlone, Esq.
McElroy Deutsch Mulvaney and Carpenter
1300 Mount Kemble Avenue
Morristown, New Jersey 07962

Re:     691 Pompton Avenue Realty, LLC v. Township of Cedar Grove
        Docket Nos. 001513-2013; 000653-2014

Dear Counsel:

This is the opinion of the court following trial of the direct appeals filed by 691 Pompton Avenue Realty, LLC ("Taxpayer") contesting the 2013 and 2014 tax year assessments on the property listed as Block 210, Lot 12 on the tax map of Cedar Grove Township ("Township"), also known as 669 Pompton Avenue ("Subject Property"). For the reasons set forth below, the court directs the Clerk to enter judgment reducing the assessments.

**<u>FACTS</u>**

At trial, each party produced testimony from a state certified general real estate appraiser. The witnesses were qualified as experts. The expert reports were admitted into evidence as stipulated by the parties. Taxpayer also produced as a witness a member of the LLC.

The Subject property is located on the corner of Pompton Avenue and Little Falls Road. The land is irregular in shape area and measures approximately 26,168 square feet, or .6008

*

acres.[1]  The property has frontage of 172 feet along Pompton Avenue (also known as Route 23) and 206 feet along Little Falls Road, with a depth of 162 feet on the property's south side, and 122 feet across the property's easterly side.  As of the valuation dates, the Subject was improved with a single-story brick/masonry and steel retail building consisting of approximately 13,991 square feet in area.  The building was erected circa 1975 and renovated to an unspecified extent during the 1990's.  The entrance to the retail building was located on Little Falls Road with a paved parking lot behind the building delineated for 22 cars.  A single curb cut on Little Falls Road at the eastern extreme of the property provided the ingress and egress to the parking lot.

The retail building served as a single-tenant retail furniture store.  At one time, a La-Z-Boy furniture store operated at the site, and most recently, it was the site of an off name furniture store. Sometime in late 2010/early 2011, the owner closed the store.  TD Bank, NA initiated foreclosure proceedings against the owner in 2011.[2]  Taxpayer acquired title to the Subject property by Sheriff's deed dated October 2, 2012.  Taxpayer previously purchased an adjacent property, which was the site of an older restaurant.  Taxpayer demolished the existing restaurant,

---

[1]    The experts differed in their opinion of the Subject land size.  According to Taxpayer's expert, he was not given a complete legal description of the land size so he relied on tax records to conclude that the land is comprised of 22,621 sq. ft. or .5193 acres.  Taxpayer's expert included a tax map in the report but testified it was the wrong map, not the map of the Subject. Township's expert relied on a land area measurement approximately 3,500 sq. ft. larger, or 26,168 sq. ft.  The expert calculated the size through use of a deed plotter, utilizing the property's metes and bounds description.  The expert's metes and bounds delineation matches the description obtained from a 1997 survey of the property and included on a Notice of Lis Pendens filed on the property on behalf of TD Bank, N.A. and made part of the expert's report. The court accepts Township's land area as more credible.

[2]    The Notice of Lis Pendens on the Subject property was filed in April 2011.  Lis Pendens is defined as "[a] notice, recorded in the chain of title to real property, required or permitted in some jurisdictions to warn all persons that certain property is the subject matter of litigation, and that any interests acquired during the pendency of the suit are subject to its outcome." Black's Law Dictionary 942 (7th ed. 1999).  The filed notice was immediately followed by TD Bank's foreclosure complaint filed in May 2011.

and completed construction of a new banquet facility in 2011 called The Grove. While the existing parking at the new banquet facility complied with the zoning, Taxpayer testified the lot was sometimes inadequate to accommodate the facility's overflow-parking needs. Taxpayer purchased the Subject, obtained variance approvals to construct a parking lot, demolished the Subject retail improvements in late 2014, and constructed a parking lot on the Subject site for use by the banquet facility.[3]

The Subject property is zoned RC – restricted commercial. The permitted uses in the zone encourage the development of the land in the RC zone primarily for retail uses, with additional provisions for professional and business offices, recreational use and commercial schools. Uses around the Subject property include a newly constructed Chase Bank located on Pompton Avenue on the opposite side of the street from the Subject, the newly constructed banquet facility adjacent to the Subject, service stations, small neighborhood shopping centers, and some nearby residential uses.

For tax years 2013 and 2014 the Subject property was assessed as follows:

|  |  |
|---|---|
| Land | $ 760,400 |
| Improvement | $ 1,414,600 |
| Total | $ 2,175,000 |

The township average ratio for the years under appeal was 100%, with a common level range of 85% - 100%.

The experts differed in their opinions of the Subject property's highest and best use. Taxpayer's expert found that the Subject building no longer offered any contributory value to the property and concluded that the Subject property should be valued as vacant for commercial

---

[3]  The Grove and the Subject are adjacent properties both located on the same side of Pompton Avenue. The properties are non-contiguous, separated by Little Falls Road that runs between them.

development as permitted under the RC zone. Township's expert found that the condition of the improvements did not warrant demolition. He valued the Subject property as improved for continued use of the existing retail improvements.

The experts' value conclusions are set forth below.

| Tax Year | Plaintiff's Expert Value | Township's Expert Value |
|----------|--------------------------|-------------------------|
| 2013 | $840,000 | $2,335,000 |
| 2014 | $840,000 | $2,245,000 |

In reaching his conclusion that the improvements contributed no value to the property, Taxpayer's expert emphasized the Subject's "history and condition." The expert relied on his observations of the property and those of Taxpayer's principal ("witness") to conclude that the property was in poor condition. The witness testified that he found the property generally lacked interior and exterior maintenance. Specifically, he observed missing ceiling tiles in the bathroom, black mold, and evidence of water leakage in the bathroom ceiling that he surmised emanated from the roof or ceiling. The building was serviced by all utilities but among the electric sockets and switches, and the HVAC units, some were not functional, and there was no running water. The building was old and outdated by today's standards, with "weird" wall coverings, mixed, and matched colors and the carpet was old, damp, and odorous. The loading dock area was "in disrepair."

The witness described the building's construction on Pompton Avenue, a roadway that runs in a north/south direction. The topography of the Subject land was sloped on its Pompton Avenue boundary such that, in photographs, the building appeared to be below grade, and the building was constructed close to the Pompton Avenue sidewalk. Due to the building's construction, it was not easily visible on the approach to the property when travelling Pompton Avenue from north to south. There was also no signage aside from the lettering painted on the

building's windows. As to the property's exterior condition, the building's stucco finish was discolored, cracking and not maintained. The stairs and sidewalk were cracked and uneven, cracks and potholes marred the parking lot, and the landscaping was not maintained. According to the witness, the property continued to deteriorate between the time of the purchase and the demolition.

Regarding the marketing of the Subject property, the witness testified that "sometime around mid-2010 or early 2011" he learned that the property was available for sale/lease, at $1.2 million for sale and $12 or $13 per sq. ft. for lease. A broker's sign was placed at the Subject property, and the witness was approached by brokers and the owner regarding his interest in the property. Taxpayer had no interest in the property for retail use. Taxpayer's purchase was motivated in part by the desire to alleviate the condition of the Subject property located immediately adjacent to The Grove and described by the witness as an "eye sore."[4]

Taxpayer's expert inspected the vacant Subject property in April 2013. He described the building as being in poor condition, "the kind of condition you would expect it to be after being vacant for a few years" but found it had no structural defects. When asked whether the building was ADA compliant, he found it was not, due to the existence of stairs at the entrance and the

---

[4] The witness also testified that he had experience developing commercial properties and that it would not be possible to rent the Subject to a national tenant without renovation. Substantial work would have been needed to renovate the property to a "vanilla box" condition. He also testified to his opinion of the overall price per sq. ft. cost to renovate both the interior and exterior of the Subject. Township objected to the testimony on the following grounds 1) a lay witness is to not competent to testify about a "vanilla box condition" or about the cost to renovate; 2) Township had previously taken the deposition of the witness but had not been advised at any stage of discovery of the witness' intention to testify about renovation; 3) Taxpayer had provided Township with no notice that it intended to rely on the witness for any purpose other than lay testimony; and 4) no expert report been provided. N.J.R.E. 701; N.J.R.E. 702; R. 4:10-2. The court found that the proffered opinion constituted technical knowledge requiring expert testimony pursuant to N.J.R.E. 701 and N.J.R.E. 702 and compliance with R. 4:10-2, and sustained the objection.

lack of a ramp. The expert was unable to offer testimony regarding the extent of needed renovation or repair, but testified that any tenant who was going to use the property would have to "re-work" the interior specific to the tenant's particular needs. Overall, the expert attributed the property's poor condition to the fact it had stood vacant for approximately four years – from the time the prior owner closed the store until the demolition of the improvements.

Taxpayer's expert addressed the adequacy of the Subject parking. He opined that the available parking complied with local zoning requirements, but determined it to be inadequate as compared to similar area retail uses. Commonly parking for a retail use similar to the Subject would be provided at four spots per 1,000 sq. ft. of building area, but the Subject property's ratio was two spots per 1,000 sq. ft., and thus inadequate in the expert's opinion.

As to the marketing of the Subject, Taxpayer's expert recalled a "flyer" he had seen "sometime before September 2012," advertising the property for sale at $1.2 million, and for lease at $12.50 per sq. ft. The expert also relied on information he obtained from Costar, a service that supplies information about property transactions. Costar reported that the Subject had been on the market for 800 days. In the expert's opinion, the fact that the owner marketed the property, and the offerings did not result in the consummation of a sale or lease, provided proof that no market existed for the retail improvements. He found the lack of interest in the property stemmed from one or more of the following factors: its poor condition caused in part by a long period of vacancy; bad visibility of the property from the roadway; or insufficient parking.

Additional facts about the property's history were significant to the expert, including: the fact that the prior owner had closed the business; Taxpayer acquired the property through foreclosure and testified that he was the sole bidder at the Sheriff's sale; and, Taxpayer purchased the property for parking, not for the commercial uses permitted by the zone, and

demolished the improvements. Based on these facts, Taxpayer's expert opined that the market had "rejected" the improvements.

Taxpayer's expert discounted use of the income approach to value the Subject, concluding that "to determine a rental rate for this building based on its condition would be difficult if not impossible."[5] Taxpayer's expert utilized the sales comparison approach and relied on properties he classified as land sales. He analyzed six sales all located in retail/commercial/business zones, using all six for both tax years. In considering the need for adjustments, the expert concluded that the real estate and credit markets suffered a period of instability ending with 2010. As such, he applied no market adjustment. The expert did adjust sales to reflect dissimilarity with the Subject property as to location and land size. The expert adjusted for location based on a review of New Jersey Department of Transportation traffic count studies for area roadways and highways, and based on his assessment of the land sales locations. Using the studies as a basis, the expert applied a 10% location adjustment to sales two, three and six since they are located on Route 17 with higher traffic counts than the Subject. Similarly, the expert found the larger land size required an upward adjustment to sales five and six, concluding that "generally, an inverse relationship exists between unit size and unit value with smaller space

_____

[5] On cross-examination, the expert acknowledged that the owner could have made some use of the building, such as for storage. However, in his opinion such a use would serve as an interim use, not the property's highest and best use, and would not produce income. Further cross-examination revealed that Township sought to have the court infer that the improvement had value because Taxpayer waited to demolish the building until he secured the necessary variances needed to develop a parking lot. The court does not find such an inference arises simply because Taxpayer chose to retain the improvements while the land was in transition, rather than leave the land vacant. "Indeed, the value of an improved property may be less than the value of the land as though vacant when demolition costs and real estate taxes are considered. The market value of the land is based entirely on its highest and best use." Appraisal Institute, The Appraisal of Real Estate, 354 (14th ed. 2013).

selling for more on a per square foot basis with the converse of this premise also being true." On that basis, he performed a paired sales analysis and adjusted sales five and six upward 25% for size. Taxpayer's expert testified that in arriving at the Subject value he had established a "tight" vacant land value range of $26-$41 per sq. ft. based on the six comparable land sales, and concluded a Subject land value of $37.13 per sq. ft. for both valuation dates. In his opinion, he "corroborated" the $37.13 value through multiplying that number by his estimated land size of 22,621 sq. ft. for a total value of $836,977, which he concluded was "in line with the Subject's sale price plus the cost of demolition, or $840,000."

The chart below outlines the land sales relied on by Taxpayer's expert.

| Taxpayer's Expert's Land Comparable Sale Grid | | | | | | |
|---|---|---|---|---|---|---|
| Comp. Sale # | Address | Sale Date/Price | Land Area/Zone | Sales Description | Traffic Count | $ per sq. ft. |
| 1 | 25 Route 46 E, Parsippany, Morris County Deed includes Shell-branding covenant through 2030. | 6/10/10 $1,025,000 Includes $25,000 for the cost of demolition. | 33,977 sq. ft. Zone-B-2 | Site contained boarded up vacant gas station demolished after sale. Seller responsible for any additional clean up per remediation agreement. | 33,000 cars/day | $30.17 per sq. ft. |
| 2 | 145 Route 17, Upper Saddle River, Bergen County | 6/29/11 $2,650,000 | 65,340 sq. ft. Zone-H-1R | Sold with vacant 17,000 sq. ft. former car dealership in poor condition, vacant for period prior to sale, then renovated to be a Maserati dealership. | 108,000 cars/day | $36.50 per sq. ft. after downward 10% location adjustment. |
| 3 | 966 Route 17, Ramsay, Bergen County Former Cury Sports store. | 1/11/12 $3,635,000 Includes $135,000 demolition costs. | 78,408 sq. ft. Zone-B-3 | Sold with vacant 16,800 sq. ft. building in poor condition, not demolished. Buyer plans to build Wawa type gas stn./market. | 108,000 cars/day | $41.72 per sq. ft. after downward 10% location adjustment. |
| 4 | Subject Property | 10/2/12 $740,000 plus $100.000 demo | 22,621 sq.ft. Zone-RC | Expert estimated $100,000 demolition costs from Marshall & Swift. | 22,000 cars/day | $37.13 per sq. ft. |
| 5 | 3419 Route 46, Parsippany, Morris County | 12/20/12 Deed price $5,000,000. Appraised at | 311,454 sq. ft. Zone-B-1 | Sold with vacant auto dealership demolished immediately after sale. Environmental issues; seller responsible for clean-up. | 28,000 cars/day | Expert report lists sale price as $7M or 28.09 per |

8

| | | | | | |
|---|---|---|---|---|---|
| | | $6,700,000 after cleanup and purchase. Originally listed for $7,000,000. | | | | sq. ft. after upward 25% land size adjustment- Expert testified to sales price of $6.7M or $21.50 per sq.ft. |
| 6 | 295 Route 17, Mahwah, Bergen County | 5/20/13 $2,600,000 | 114,998 sq. ft. Zone-B-40 | Vacant, raw land, mid-block property on Route 17 approximately one mile south of Route 287 merger. | 100,000 cars/day | $26.00 per sq. ft. after downward 10% location adjustment and upward 25% land size adjustment. |

The Subject building was demolished in 2014 so Township's expert was unable to inspect it in connection with the present appeals. He relied largely on documentary evidence regarding condition, though he claimed some personal knowledge about the property based on a purchase there in 2010 and an inspection he conducted in 2005. Township's expert relied largely on photographs contained in Taxpayer's expert report and photographs on file with the Township, as well as an inspection report prepared in 2013 on behalf of a bank and produced by Taxpayer in discovery that reported the property condition as fair to average. Township's expert concluded that the Subject property was in fair to average overall condition and required only cosmetic interior and exterior repairs. In his opinion, the Subject property should be modified through renovation to a "vanilla box" condition for lease to a retail tenant.[6] Township's expert

---

[6]  The court in Pine Plaza Assocs., LLC v. Hanover Twp., 16 N.J. Tax 194, 211 (Tax 1996), defined "vanilla box" as construction cost of landlord encompassing: "installation of drywall partition walls, installation of dropped ceiling with lighting; installation of bathroom plumbing; installation of heating, ventilating, and air conditioning ducts and registers; installation of electric services and outlets; and installation of floor covering consistent of one-half carpet and one-half tile."

opined that the "subject area recognizes" retail properties are marketed and leased as "vanilla boxes" ready for "new tenant occupancy, tenant improvements and trade fixtures." The expert concluded that continued retail use of the property would require renovation estimated at a cost of $20.00 per sq. ft. "based on Marshall & Swift," however, he provided no itemized cost, nor any basis for the $20.00 figure. Township's expert utilized the income approach to value, deriving a market rental of $17.25 per sq. ft. from leases at six area retail/commercial properties, located both inside and outside of Cedar Grove.[7]

Township's expert agreed with Taxpayer's expert that as vacant the highest and best use of the Subject was for commercial development in accordance with RC zone. Therefore, he included four land sales in his report, but did not rely on them in arriving at his conclusion of value.

| Township's Expert's Land Comparable Sale Grid | | | | | |
|---|---|---|---|---|---|
| Comparable Sale # | Address | Sale Date/Price | Land Area/Zone | Sales Description | $/Sq. Ft. |
| 1 | 664-674 Pompton Avenue (a/k/a N.J. State Highway Route 23) Cedar Grove | 8/17/10 $1,184,000 plus $150,000 cost of demolition. | 37,519 sq. ft. Zone-RC | Site sold w/ approvals for Chase bank branch. Contained existing gas station and 2 retail units. | $35.55 per sq. ft. |
| 2 | 464 Eagle Rock Ave West Orange | 10/8/10 $1,800,000 plus $150,000 estimated demolition cost. | 57,717 sq. ft. Zone-B-2 | Site sold w/ approvals for 9,900 sq. ft. bank branch and retail space. Contained existing restaurant demolished by purchaser. | $33.79 per sq. ft. |

---

[7] While the court finds the value of the Subject is best derived from use of the sales comparison approach rather than the income approach, to be discussed further, the court also disregards Township's expert's lease comparables as unreliable where effective cross-examination revealed that the location of the leased properties may have been misidentified by the expert. In addition, three of the leased properties bore little similarity to the Subject since they were located in two large shopping centers, one of which identified the stores by a large pylon sign on the property. The two other properties consisted of leased space ten times smaller than the Subject located in newer strip malls vitiating comparability to the Subject.

| 3 | 4 Franklin Ave., Nutley | 9/21/12 | .1147 acre (4996 sq.ft.) Zone-B-3 | Site sold w/o approvals. Unclear whether vacant when sold. Approvals later obtained for 2-sty, 1,512 sq ft. mixed use retail and 2 apts. | $30.00 persq. ft. |
| 4 | 45-51 East Centre Street, Nutley | 10/4/11 $1,165,000 | .4017 acre (17,498 sq.ft.) Zone-B-4 | Sold w/ approvals for 3-sty mixed-use bldg for 8,200 sq ft of retail space and 35 apts. | $66.57 per sq. ft. |

## ANALYSIS

*Presumption of validity*

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). The presumption arises from the view "that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law." Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985).

"In the absence of a R. 4:37-2(b) motion . . . the presumption of validity remains in the case through the close of all proofs," MSGW, 18 N.J. Tax at 377. Before proceeding to weigh the evidence, the court "must first determine whether the presumption of validity has been overcome." Ibid. "In making this determination, the court should view the evidence as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion." Ibid. Such a determination requires that the court accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995)). In order to overcome the presumption, the evidence "must be 'sufficient to

determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment." West Colonial Enters., LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div.), certif. denied, 165 N.J. 488 (2000). Only after the presumption is overcome with sufficient evidence at the close of proofs must the court "appraise the testimony, make a determination of true value and fix the assessment." Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982) (citations omitted).

The court finds Taxpayer has produced sufficient evidence to overcome the presumption of validity attached to the assessment as to both tax years. Taxpayer presented evidence of land sales as proof that the Subject's true value is substantially below the equalized assessed value of the property. The court finds that the evidence is sufficient to raise a debatable question regarding the validity of the assessment. Therefore, the court will proceed to consider the evidence presented by both parties in an effort to find value. Ford Motor Co. v. Township of Edison, 127 N.J. 290 (1992).

*Highest and Best Use*

In New Jersey, the value of real property is based on a sale of the property between a hypothetical buyer and seller. The objective is to "determine the full and fair value . . . at such price as . . . it would sell for at a fair and bona fide sale by private contract on October 1 . . . [of the pre-tax year]." N.J.S.A. 54:4-23. For the purpose of assessing tax, property must be valued at its highest and best use. Ford Motor Co., 127 N.J. 290. "The concept of highest and best use is not only fundamental to valuation but is a crucial determination of market value. This is why it is the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp.,

10 N.J. Tax 153, 161 (Tax 1988).  See also American Cyanamid Co. v. Wayne Twp., 17 N.J. Tax 542, 550 (Tax 1998), aff'd, 19 N.J. Tax 46 (App. Div. 2000).  In order to constitute the property's highest and best use, four factors are considered.  The use must be 1) legally permissible, 2) physically possible, 3) financially feasible, and 4) maximally productive.  The Appraisal of Real Estate at 333.  See also Ford Motor Co., 10 N.J. Tax at 161; Clemente v. Township of South Hackensack, 27 N.J. Tax 255 (Tax 2013), aff'd o.b. 28 N.J. Tax 337 (App. Div. 2015).  The four criteria are considered sequentially, though "physical possibility and legal permissibility can be applied in either order . . .  they both must be applied before the test of financial feasibility and maximum productivity.  A use may be financially feasible, but this is irrelevant if it is legally prohibited or physically impossible."  The Appraisal of Real Estate at 335.

Actual use of the property is of prime concern in a highest and best use analysis.  The general rule in real property taxation is that property must be valued "in the actual condition in which the owner holds it."  Newark v. Township of West Milford, 9 N.J. 295, 303 (1952); State v. Abbott, 42 N.J.L. 111, 115 (1880).  "However, this general concept is modified to avoid a disproportionate share of the burden of taxation falling upon the other taxpayers when "its value in that condition is affected by what can be done with the property."  Delaware, L. & W. R. Co. v. City of Hoboken, 16 N.J. Super. 543, 570 (App. Div. 1951), rev'd on other grounds, 10 N.J. 418 (1952).  The property should be examined for all possible uses and that use which will yield the highest return should be selected.  Inmar Assocs. v. Township of Edison, 2 N.J. Tax 59, 64 (Tax 1980).  Ultimately, the determination is market driven.  Ford Motor Co., 127 N.J. 290 (highest and best use "implements a market value standard.").

In arriving at a determination of the highest and best use of a property, the "theoretical focus of highest and best use analysis is on the potential uses of the land as though vacant. In practice, however, the contributory value of the existing improvements and any possible alteration of those improvements are just as important in determining highest and best use and . . . in developing an opinion of the market value of the property." The Appraisal of Real Estate at 337.

> [A]n appraiser needs to test whether the existing improvements contribute value, rather than simply assume that the current use is the highest and best use because the improvements are already in place. . . . Demolition of improvements can be considered the most extreme form of modification to the current use of the property as improved. If the value of the property as improved is greater than the value of the site as though vacant less demolition costs, the existing improvements contribute value to the property's highest and best use, and the improvements should not be demolished at that time. When the improvements no longer contribute to value, demolition and redevelopment of the ideal improvement would be economically supportable.
>
> [The Appraisal of Real Estate, at 346.]

Based on the testimony of the experts and the location of the property in the RC zone, the court finds commercial use is the highest and best use of the Subject property. The next consideration requires analysis of the evidence as it relates to continued use of the Subject improvements.

In that regard, the court finds that the building's characteristics affect the property's financial potential. The building was not aesthetically pleasing where it was low and long along Pompton Avenue, and the building's end disappeared below grade. The court finds the manner of construction rendered the Subject building functionally obsolescent. Functional obsolescence is generally subject to cure when money spent "to cure the item will result a value increment equal to or greater than the expenditure." The deficiency here resulted from the building location

and manner of construction, which would require that the building either be moved or demolished. Short of that, the desirable nature of the property would remain hampered by the aesthetics of the building's manner of construction and its low visibility from the roadway, characteristics of limited desirability in the market.

The building's construction allowed minimal opportunities for well-placed signage at the property. In one photograph, the only sign advertising the store appeared as lettering applied to the store windows not easily viewed by a driver travelling in the lanes nearest the building. Another depicts the name "A Z Furniture" lettered across the top of the entryway on Little Falls Road. The sign was visible only to drivers approaching the store from one direction on Pompton Avenue. As noted, the view of the building itself was limited on the approach travelling from north to south on Pompton Avenue because the northerly end of the building was barely visible. For commercial and retail uses, "physical characteristics such as visibility, attractiveness, quality of construction and condition of properties" are factors that influence property value. The Appraisal of Real Estate at 177. "The structural design features of commercial buildings are constantly changing. Developers want the most competitive building possible, within the cost constraints imposed by economic pressures . . . ." Id. at 262. Considering the characteristics of the improvements, the court finds an investor would have interest in use of the land for redevelopment over reuse of the Subject improvements.

The court finds redevelopment of the Subject property would meet the legal and physical prongs and be maximally productive. Testimony by Taxpayer's expert supports a finding that under the Cedar Grove zoning ordinance the Subject property could be developed as a commercial use as of right. Requirements under the zone would permit development of a 5,000 – 5,500 sq. ft. commercial building. Cedar Grove Ord. Sec. 268-3. Moreover, the Cedar Grove

15

land sales and property uses in the area reflect a trend for new construction in the RC zone during the relevant valuation dates. Older commercial buildings in poor condition were being acquired, demolished, and redeveloped for commercial uses. Immediately adjacent to Subject property Taxpayer purchased and demolished an old restaurant and built The Grove catering facility, in 2011, three years before the first valuation date at issue in this matter. A purchaser acquired the Chase bank property and redeveloped the site within the same timeframe, on land nearly the same size as the Subject. At the time of purchase, the Chase property contained an older gas station and two retail uses. The buyer demolished the improvements and redeveloped the property. The evidence reveals that other area towns exhibited the same trend. The Subject's size, its location on Pompton Avenue with abundant frontage, at an intersection, in the RC zone, are characteristics valued for commercial use in the market. The totality of these factors serve as credible evidence that the improvement had reached the end of its useful life and the market would no longer attribute value to the Subject improvements.[8]

Other factors the court did not consider persuasive influenced Taxpayer's expert's opinion of the Subject's highest and best use. The court finds they warrant comment. For example, an established connection between the fact that the prior owner discontinued the

---

[8]    Additionally, based on a reading of the parking and bulk requirements in the Cedar Grove zoning ordinance the court finds the Subject improvements to be non-conforming. The ordinance limits the maximum lot coverage of the principal building to 20%. The zone requires parking at one spot per 250 sq. ft. or 300 sq. ft. of building area, depending on the commercial use. The law permits pre-existing, non-conforming structures to continue, N.J.S.A. 40:55D-68, but the ability to modify them is restricted. Town of Belleville v. Parillo's, Inc., 83 N.J. 309 (1980) (such restriction can include "the enlargement or extension of the repair or replacement of nonconforming structures"). The record lacks expert testimony detailing the extent and cost of the renovation required to attract a tenant to the Subject property, but the experts agreed that some degree of modification would be needed. Those facts provide further persuasive evidence that the Subject property should be valued as vacant for commercial development as permitted by the requirements of the RC zone.

business at the Subject and a lack of market interest in the property is absent from the record. Any number of reasons could underlie the owner's actions that have no bearing on market interest in the real estate. Without more, the mere fact that the owner closed the store is unrelated to the value of the real property or the level of market interest in the property. Berkley Arms Apartment Corp. v. Hackensack City, 6 N.J. Tax 260 (Tax 1983) (valuations of properties for local taxation cannot vary with the managerial success or failure of the owners). Based on the same rationale, the court does not find the fact that the property was sold through foreclosure to be a valid indicator of how the market views property since the foreclosure could well have resulted from considerations tied to the prior owner's business unrelated to the real estate.

The court finds Taxpayer's purchase of the Subject for sole use as a land site to construct a parking lot to be a circumstance related to the subjective motive of the taxpayer rather than an indication of relevant market-based activity. Value is based on a hypothetical purchase between a willing buyer and seller. A buyer's motivation is not a sufficient basis for an appraiser's determination of highest and best use. Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 547-8 (Tax 2000) (citations omitted). Finally, Taxpayer's expert found evidence that the prior owner unsuccessfully marketed the property for sale/lease supported his opinion that the building was rejected by the market. While the court does not find the evidence supports such a conclusion, it did provide some proof that the property would sell for something less than $1.2 million and/or could not command a lease rental at $12-$13 per sq. ft.

*Valuation*

"There is no single determinative approach to the valuation of real property." 125 Monitor St. LLC v. Jersey City, 21 N.J. Tax 232, 237-8 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v.

**17**

Township of East Brunswick, 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citations omitted)). The three approaches include the income, market or sales approach and the cost approach. The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of N.Y. v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537, 189 (1963)).

The income approach, utilized by Township's expert, is the favored method for arriving at value when a property is income producing. Parkway Vill. Apartments Co. v. Cranford Twp., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987). The sales comparison approach requires an evaluation of market transactions that examines the recent sale of similar properties. That approach involves a "comparative analysis of properties" and requires the expert to focus on the "similarities and differences that affect value . . . which may include variations in property rights, financing, terms, market conditions and physical characteristics, among others." The Appraisal of Real Estate at 378. "When data is available, this [approach] is the most straightforward and simple way to explain or support an opinion of market value." Greenblatt v. Englewood City, 26 N.J.Tax 41, 53 (Tax 2010) (internal citation omitted). A "major premise of the sales comparison approach is that an opinion of market value of a property can be supported by studying the market's reaction to comparable and competitive properties." The Appraisal of Real Estate at 377. "Sales comparison may be used to value land that is actually vacant or land that is being considered as

though vacant for appraisal purposes. Sales comparison is the most common technique for valuing land, and it is the preferred method when comparable sales are available." Id. at 364.

The court finds the sales approach is the best-suited method under the facts since the court here views the property as land only, for purposes of valuation. Because the court rejects the income approach as a value methodology, it places no reliance on the leases utilized by Township. In analyzing evidence of land sales, the court accepts as reasonable Taxpayer's expert's adjustment for location. The court finds Taxpayer's expert's land sales two and three, as adjusted, provide credible evidence of the Subject's value. The court also finds Township's expert's land sale one (Chase Bank sale appearing in both reports), and land sale two, provide reliable evidence of the Subject's value.

Taxpayer's expert's sale two, 65,340 sq. ft. of land ($36.50 per sq. ft. after 10% location adjustment), was improved with a car dealership since closed and renovated for use as a Maserati dealership, located on Route 17 in Upper Saddle River. It was located in the C-commercial zone and it sold closest in time to the valuation dates. The property sold containing a 17,000 square foot building in poor condition that had been closed and boarded up for years prior to purchase. Unlike the Subject, the buyer renovated and repurposed the building as a Maserati dealer rather than electing demolition. On cross-examination, counsel challenged Taxpayer's expert's opinion of the comparable property as a land sale, when in fact the building had not been demolished. In the expert's opinion, the only part of the building reused were "the bones." It was otherwise a new building, and in fact may have included an addition to the building not a part of the original. The evidence supports a finding that the property transfer represents a land sale.

Taxpayer's expert's sale three, 78,408 sq. ft. of land ($41.72 per sq. ft after 10% location adjustment), was the former site of a retail store named Cury Sports, on Route 17, zoned B-3

Highway Commercial. As of the valuation dates the store was closed, the building was in poor condition, but had not been demolished. Photographs in the expert report depict boarded windows. On cross-examination, Township's counsel's suggested that the owner made continued temporary use of the property for seasonal sales. Taxpayer's expert opined that such a scenario would constitute an interim use of the property, and it was an unlikely fact given the boarded windows. The expert testified to information about the potential development of the property as a Wawa-type gas station/retail use. The court concludes the transfer represents a land sale.

Township's expert's sale one, 37,519 sq.ft. of land ($35.55 per sq.ft), is the Chase bank property common to both experts' reports. The property sold with approvals for a bank and retail space. The property is located across the street from the Subject, in the RC zone, it sold within the relevant timeframe, it is similar in size to the Subject, and the prior retail uses were demolished after purchase.

Township's expert's sale two, 57,717 sq.ft. of land ($33.79 per sq.ft.) is located in West Orange on a four-lane roadway and zoned B-2. The land is twice as large as the Subject land. The property was sold and redeveloped as a 9,000 sq.ft. bank and retail space.

The court rejects Taxpayer's expert's sales one, four, five and six. Sale One was the site of a former Shell gas station. The Deed includes a Shell-branding covenant through 2030 that requires that the property continue as a gas station through 2030, either by sale to a Shell station operator, or by requiring that the operator sell Shell gas. In fact, the buyer was the owner of several Shell gas stations. Because of the limitation on transfer in the branding agreement, the court finds the sale did not result from the property's exposure to the open market. As such, the court finds it does not represent reliable evidence of value and rejects sale one.

Taxpayer's expert's sale four was the sale of the Subject. The property was sold as a distressed property in foreclosure. The court finds the transaction did not represent an arms-length sale between a willing buyer and seller, neither under duress, and the sale fails to serve as credible evidence of the property's market value.

The court rejects Taxpayer's expert's sale five for several reasons. The property contained a former automobile dealership demolished after purchase. The property suffered from environmental issues at the time of sale with seller responsible for the cost of cleanup. After cleanup, the buyer paid a reported $5,000,000 for the property per the Deed and had the property appraised for $6,700,000 a year later. The expert relied on the appraisal without seeing the document or speaking with the appraiser, and he was unaware of the date of the appraisal. The court also rejects the evidence as unreliable where the expert testified he utilized $6,700,000 as the sales price and opined that it represented "the value of the property" but in the report, he utilized the $7,000,000 figure as the sales price. Moreover, the land was 311,454 square feet (7.5 acres) in size, or twelve times larger than the Subject, which vitiates comparability.

Taxpayer's expert's sale six consisted of 2.64 acres or 114,998 sq. ft. of vacant, raw land ($26.00 per sq. ft.). The expert applied an upward 25% adjustment for land based on a paired sales analysis he conducted. While the court finds the sale warrants an adjustment for land, the paired sales methodology utilized was flawed. The expert calculated the average adjusted price per sq. ft. of his two largest sales by land size, numbers five and six, and compared the average number to the price per sq. ft. of sale four, the smallest land size, to arrive at the percentage adjustment. A paired sales analysis can be an effective tool to calculate an adjustment when sales of "nearly identical properties except for one characteristic is analyzed to isolate the single characteristic's effect on value . . . ." The Appraisal of Real Estate at 399. Land sale six differed

by more than one characteristic where the expert adjusted the comparable sale for different location. The expert also used sale five in the paired sales analysis, which sale price the court found to be unreliable. Therefore, use of sales five and six affected the validity of the expert's method for arriving at the land size adjustment. The court will disregard both the land adjustment and sale six.

The court rejects Township's expert's sale three since important details were missing from the testimony about the property transaction. The expert was unsure whether the land was vacant when sold, or whether demolition costs should have been considered. Moreover, the property sold with approvals for the construction of a mixed-use building consisting of first floor retail space and two second floor apartments, a different highest and best use than the Subject. The court also rejects Township's expert's sale four, 17,500 sq. ft. in size ($66.57 per sq.ft.). The property sold with approvals for a three-story mixed-use building consisting of 8,200 square foot of retail and 35 apartments, a different highest and best use than the Subject.

The court concludes that the following land sales provide reliable evidence of the Subject's property value: Township's expert's sale one at $35.55 per sq. ft. (common to both experts); Township's expert's sale two at $36.50 per sq. ft.; Taxpayer's expert's sale two at $33.79 per sq.ft.; and Taxpayer's expert's sale three at $41.72 per sq. ft. Placing the most weight on the sale at $35.55 per sq. ft., and then to the sale at $33.79 per sq. ft., and lesser weight to the remaining sales, the court finds the value of the Subject property for each tax year to be $37.00 per square foot. $37.00 x 26,168 = $970,000 (rounded).

Pursuant to N.J.S.A. 54:51A-6a, commonly referred to as Chapter 123, in a non-revaluation year an assessment must be reduced when the ratio of the assessed value of the property to its true value exceeds the upper limit of the common level range. The common level

range is defined by N.J.S.A. 54:1-35a(b) as "that range which is plus or minus 15% of the average ratio" for the municipality in which the Subject property is located. The true value determined above must be compared to the average ratio for Cedar Grove Township for tax years 2013 and 2014. The formula for determining the Subject property's ratio is:

Assessment ÷ True Value = Ratio

Here that equation presents as follows:

$2,175,000 ÷ 970,000 = 224%

The chapter 123 average ratio for Cedar Grove for both 2013 and 2014 exceeds 100%. Where both the average ratio for the municipality and the ratio of the assessed value of the property to its true value exceed 100%, the court will enter Judgment revising the assessment at 100% of the subject property's true market value. N.J.S.A. 54:51A-6(c). Because there were existing improvements on the land on the dates of valuation, the court will assign a nominal value to the improvements. Appel v. City of Englewood, 15 N.J. Tax 537, 546-7 (Tax 1996); N.J.S.A. 54:4-26; N.J.A.C. 18:12-2.8b.

The Clerk of the Tax Court shall enter Judgment setting the tax year assessments for 2013 and 2014 on the Subject property, as follows:

| | |
|---|---|
| Land | 960,000 |
| Improvement | 10,000 |
| Total | 970,000 |

Very truly yours,

Christine Nugent, J.T.C.

**23**